Laramore, Judge,
delivered the opinion of the court:
This is a suit to recover the increased costs of performance on a Government, contract. The increased costs are claimed to have resulted from delays caused by the defendant’s failure to give proper notice to proceed as required by the terms of the contract. The facts upon which plaintiff predicates its suit are as follows:
In April 1950, the Bureau of Keclamation, hereinafter referred to as the Bureau, invited bids for the construction of a 230-kilovolt electrical transmission line between Bio Vista and Tracy in the Central Valley of California. The invitation to bid provided that the work was to be divided into two schedules. Schedule No. 1 covered the construction of foundations and the erection of steel towers for the transmission lines. Schedule No. 2 consisted of two parts; Part I provided for the stringing of conductors and overhead ground wires on the towers to be erected under Schedule No. 1, and Part II called for the stringing of conductors and overhead ground wires for the Sacramento and San Joaquin Biver crossings.
Plaintiff submitted a low bid for the work called for under Schedule No. 2, and on May 31, 1950, the plaintiff and the Bureau, acting for the United States, entered into a unit price contract for the work called for by that schedule. The contract was a standard form Government contract which required the defendant to supply the necessary conductors, ground wire, insulators and hardware needed by *611 tbe plaintiff for the installation of the transmission line. The specifications which were attached to and made a part of the contract contained the following provision:
22. Commencement, prosecution, and completion of worlc. The contractor shall begin work within twenty (20) calendar days after date of receipt of notice to proceed and shall complete all of the work within the following number of calendar days from the date of receipt of such notice: Schedule No. 1, three hundred and five (805) days; and Schedule No. 2, three hundred and sixty-five (365) days; Provided, That if award of contract for the work under Schedule No. 2 is made to a contractor other than the contractor awarded the contract for work under Schedule No. 1, notice to proceed for the work under Schedule No. 2 will be issued at the discretion of the contracting officer any time within two hundred and forty (240) calendar days for the work under Part I, and two hundred and seventy-five (275) calendar days, for the work under Part II, after date of award of the contract, and the contractor under Schedule No. 2 shall complete all work under Part I within one hundred and twenty-five (125) calendar days and all work under Part II within ninety (90)' calendar days, from the date of receipt by him of such notice. * $ ‡ ¥
Immediately after the consummation of the contract, levees protecting one of the islands in the San Joaquin River broke which caused flooding of a portion of the land over which the transmission line was to be strung. The Bureau upon learning that the levees, which were privately owned and maintained, were not to be rebuilt decided to reroute a portion of the line covered by plaintiff’s contract. It also redesigned the transmission towers increasing the height of their foundations, and new rights-of-way had to be negotiated over the rerouted area.
Plaintiff heard of the flooding and wrote the Bureau on July 26, 1950, asking for the approximate location of the rerouted lines and whether the river crossings were to remain as planned. This letter also requested some idea as to the starting and completion time on the contract. In response the Bureau, on July 28, 1950, sent plaintiff a drawing showing the new routing of the line and advised it that the river *612 crossings were about the same as previously specified. The Bureau then stated:
It is estimated, by this office, that the. tower erection for the Rio Vista-Tracy Section of the line will be well enough advanced to enable you to begin stringing operations about October 1. It is estimated that the river crossing towers should be available for stringing approximately December 15. We will endeavor to inform you well in advance of the issuance of Notice to Proceed so that you may make your plans accordingly.
The Bureau, however, did not give the changes to the contractor for the river crossing towers until September 13,1950, and the line towers contractor did not receive its changes until December 21,1950. On November 24,1950, the Bureau notified plaintiff that the proposed dates for issuance of the notices to proceed contained in its letter of July 28,1950, had to be advanced to March 1, 1951, for the line route and to February 15,1951, for the river crossings.
On December 22,1950, the Bureau wrote plaintiff stating that under the contract the Bureau was required to issue a notice to proceed on Part I (line route) within 240 calendar days after the award of the contract and that this time expired on January 26,1951. The Bureau desired to withhold issuance of the notice until work under Schedule No. 1 (construction of the towers) had further progressed. Plaintiff replied agreeing to a postponement upon the condition that the Bureau “reimburse us for any additional costs that we might incur due to increased wages and working conditions demanded and awarded to the Local Unions having jurisdiction”. Thereafter on January 25, 1951, plaintiff received a notice to proceed with its work under Part I. This letter read, in material part, as follows:
Pursuant to the provisions of paragraph 22 of the specifications, you are hereby notified to proceed with the work covered by this contract. The date you receive this letter, as shown on the registry return receipt, will be the effective date in computing the time within which completion of the contract is required.
Inasmuch as the work covered by Schedule 1 of subject specifications is not sufficiently advanced for you to begin your stringing operations, it will be necessary for *613 us to grant an extension of time for the completion of your contract. This delay will be made the subject of a Findings of Fact which will be issued at a later date.
On March 1,1951, plaintiff was sent a similar letter regarding the work to be performed under Part II of its contract. The effect of these letters was to give literal notice to proceed as required under the specifications to the contract while at the same time suspending the work which the defendant had a right to do under paragraph 14 of the specifications, page 7.
On August 21,1951, plaintiff was notified that on September 1,1951, it could begin work on Part 1 and that an extension of time for performance would be granted from the date on which notice to proceed was issued until such time as it was possible for plaintiff to proceed. Such an extension on Part I was in fact granted from January 27 to August 31, 1951. A similar letter was received by plaintiff with respect to Part II directing work to begin on the river crossings October 22, 1951. Plaintiff was also granted an extension of time for the period from March 3 to October 21,1951.
As a result of these delays plaintiff was required to carry on its work in unseasonable weather which slowed and inhibited its performance. Realizing that such was the case the defendant further extended the time for performance to the dates upon which each part of the work was formally accepted, i. e., April 25,1952, for Part I and March 31, 1952, for Part II.
By letter dated May 23, 1952, plaintiff submitted to the contracting officer a claim for additional compensation in the amount of $53,335.13 for added costs due to the delay in issuing notices to proceed. The claim was denied by the contracting officer and this denial was approved by the Solicitor of the Department of Interior acting under authority of the Secretary. The denials of relief were based on the ground that the claim was one for unliquidated damages which were not reimbursable under the contract.[1] Thereafter a suit for damages was brought in this court on the ground that the *614 defendant breached the contract by failing to give actual notices to proceed within the time required by paragraph 22 of the specifications to the contract. It is alleged that none of the additional costs would have occurred but for such failure on the part of the defendant. A commissioner of this court charged with the duty to take evidence and make findings of fact has reported that: (1) The defendant’s delay in issuing effective notices to proceed resulted in performance of the work in a period when plaintiff was obliged to pay increased rates of wages for labor; (2) This delay also caused plaintiff to perform the work in the winter rainy season with resultant loss of efficiency of labor and equipment.
The elements and computations making up the increased costs caused by the delays are set forth in detail in findings 23 through 37. The total increased costs reasonably attributable to the delays on the part of the defendant are found by the commissioner to be $13,474.26. Both parties have taken exception to this figure, but we feel that it fairly represents the actual loss suffered by the plaintiff. Therefore, the sole question to be decided by this court is whether or not the plaintiff may recover this amount from the defendant. We think it is so entitled for the following reasons:
The contract specifications called for the defendant to give plaintiff notice to proceed within a specified period of time. It is clear from the recited facts that this provision was not complied with. True the defendant purported to give notice to proceed and then in the same letter invoked the section which allowed it to suspend operations. A notice to proceed is an order by the Government to the contractor to get its equipment and men on the job and begin performing the work called for under the contract, Peter Kiewit Sons' Co. v. United States, 138 C. Cls. 668. Clearly this was not the effect of the letters of January 25 and March 1, 1951, to the plaintiff. Those letters were apparently an attempt on the part of the defendant to circumvent the contract requirement that it issue notices to proceed within a certain time and should not be given the standing of notices to proceed. It seems to us that this was a breach of the plain and unambiguous terms of the contract.
*615 Defendant says that this case presents a situation closely analogous to United States v. Foley Co., 329 U. S. 64. In that case the contractor was delayed 157 days in the performance of its contract by reason of the failure of the Government to make the job site available. Plaintiff there had contracted to install a lighting system at Washington’s National'Airport. Its obligation, in the nature of a “follow-up contract,” was to be discharged when and as Gqvernment engineers made runways available to plaintiff. The Supreme Court in reversing this court’s judgment for the plaintiff held that since the contract in question neither expressly nor impliedly warranted that the site would be made available within a certain time, no liability for damages due to delays could attach to the Government, citing Crook Co. v. United States, 270 U. S. 4, and United States v. Rice, 317 U. S. 61.
We feel that a careful reading of the Foley decision, however, rather than weakening, fully supports plaintiff’s claim for recovery in this case. Initially the Supreme Court therein stated that the issue before it was not one involving a breach by the Government of an express covenant found in the contract. Thus, in the words of the Court at page 66: “In no single word, clause, or sentence in the contract does the Government expressly covenant to make the runways available to respondent at any particular time * * The inference to be drawn from this language seems obvious. Moreover, the Court extended its argument by stating that Government liability might be implied from the terms of the contract. As the Court reasoned, if by implication the contract had included an unqualified warranty to make the runways promptly available which was breached by defendant, plaintiff’s claim for damages would have been allowed. However, a close examination of relevant provisions of the Foley contract satisfied the Court that such an implied warranty did not exist. As a consequence, the contractor there was held entitled only to the relief provided for in the contract for Government-induced delay; viz, a time extension.
We think the Supreme Court’s preliminary statement concerning an “express covenant,” and the inference which *616 accompanies it, is sound in law and applicable to the facts before us.[2]
Here the express covenant is found in paragraph 22 of the contract specifications. That paragraph reads:
* * * [N]otice to proceed for the work under Schedule No. 2 will be issued at the discretion of the contracting officer any time within two hundred and forty (240) calendar days for the work under Part I, and two hundred and seventy-five (275) calendar days, for the work under Part II, after date of award of the contract * * *. [Emphasis supplied.]
As mentioned above, this provision of the contract was not complied with by the Government. The delay thereby growing out of the breach caused plaintiff to sustain added expenses in the completion of its contract (finding 22). Furthermore, the fact that the Government might not have been negligent in meeting its obligations under the contract is beside the point where delays attributable to it constituted a breach of contract. See Kehm Corp. v. United States, 119 C. Cls. 454.
It necessarily follows that plaintiff is entitled to recover its actual damages caused by defendant’s failure to give notices to proceed as provided by the contract. Judgment will therefore be entered for the plaintiff in the amount of $13,474.26.
It is so ordered.
MaddeN, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
BINDINGS OE EACT
The court, having considered the evidence, the report of Commissioner George H. Foster, and the briefs and argument of counsel, makes findings of fact as follows:
*617 1. Plaintiff, Abbett Electric Corporation, an electrical contractor, is and at all times herein pertinent was a corporation organized and existing under the laws of the State of California, with its office and principal place of business located at 85 Federal Street in San Francisco.
2. Under date of April 14,1950, defendant, acting through the Bureau of Reclamation, invited bids on the construction of a 230-kilovolt electric transmission line between Rio Vista and Tracy in the Central Valley of California. By the invitation for bids, the work was divided into two parts. Schedule No. 1 covered the construction of foundations and erection of steel towers for the transmission lines. Schedule No. 2 consisted of two parts: Part I covered the stringing of conductors and overhead ground wires on the towers to be erected under Schedule No. 1, while Part II covered the stringing of conductors and overhead ground wires for the Sacramento and San Joaquin River crossings. The towers for the river crossings were to be constructed by a different contractor under a separate contract with defendant.
3. Plaintiff submitted a bid only on Schedule No. 2. This was the low bid on this schedule, and plaintiff was awarded the job. It thereafter entered into a contract with defendant for the performance of the Schedule No. 2 work, this contract being dated May 31, 1950, and being numbered 12r-19003.
This contract was a unit price contract under which defendant was obligated to furnish the required conductors, ground wire, insulators, and hardware. The contract was the standard Government form, and contained the standard Article 9, Delays — Damages, and the standard Article 15, Disputes.
4. The specifications which were attached to and made a part of this contract, contained the following provisions:
16. Description of the transmission line. The transmission line to be constructed and completed under these specifications will be a 230,000-volt, 3-phase, 60-cycle, double circuit, steel tower line approximately 26 miles long, including stringing of approximately two miles of special crossing spans over the Sacramento and San Joaquin Rivers. The line will extend from a point near Rio Vista, California, to the Tracy Switchyard, *618 near Tracy, California. The conductors will be 795,000 circular mil, 26/7 stranding steel-reinforced aluminum conductors having an outside diameter of 1.108 inches, except for the river crossings, which will be 795,000 circular mil, 30/19 stranding steel-reinforced, aluminum conductor having an outside diameter of 1.140 inches. The line will have two overhead ground wires of %6-inch extra high strength copperweld strand installed for the entire distance except for the river crossings, which will have %6-inch extra high-strength copperweld strand installed. The line is designed for California light loading conditions of no ice and a wind pressure of 8 pounds per square foot at 25° F. Except as otherwise specified, all construction and clearances of the transmission line shall conform to the “Rules for Overhead Line Construction, General Order No. 95,” prescribed by the California Railroad Commission. The line will be constructed as follows:
(a) Schedule No. 1 — The work to be performed under this schedule of the specifications will consist of the erection of approximately 24 miles of double-circuit steel towers from a point east of the Sacramento River approximately one mile southeast of Rio Vista, California, in a south and southeasterly direction, to the Tracy Switchyard, near Tracy, California. The work shall consist of clearing of right-of-way, constructing tower foundations, erecting steel towers, installing and connecting ground rods to towers, attaching warning signs to towers as required, numbering towers, installing fence ground rods, and installing gates in right-of-way fences. There will be no transposition towers in the line.
(b) Schedule No. 2 — Part I — -The work to be performed under this part of the schedule shall consist of assembling and attaching insulator strings and hardware and of stringing and attaching 6 conductors and both overhead ground wires for the line described under subparagraph (a) above.
(c) Schedule No. 2 — Part II — All of the work for the Sacramento and San Joaquin River crossings similar to that described tinder subparagraph (a) above, will be performed under a separate contract. The work to be performed under this part of the schedule of the specifications will consist of assembling and attaching insulator strings and hardware and of stringing six conductors and two overhead ground wires for the river crossings described under subparagraphs c-1 and c-2 below.
*619 c-l Sacramento River crossing — This crossing will be located approximately as shown on the General Location Map, Drawing No. 214-D-16790 and arranged as shown on Drawing No. 214-D-16827. The total overall length of the crossing will be approximately 6,000 feet. The crossing will be made in three spans on four double-circuit steel towers — two suspension, and two dead-end — which will be erected by the Government under another contract. The main crossing span will be approximately 3,800 feet long and will be supported on two suspension-type towers, each approximately 435 feet high overall. ' The two anchor spans will each be approximately 1,100 feet long and will be dead-ended on anchor-type towers, each approximately 120 feet high overall. The work required at this crossing will be:
c-l-a Assemble and attach to towers, insulator and hardware arrangements as shown on Drawing No. 214-D-16637. Six conductor and two overhead ground wire dead-end assemblies will be required for each anchor tower, and six conductor and two overhead ground wire suspension assemblies will be required for each suspension tower.'
c-l-b String, sag, armor, and clip-in six 795,000 C. M., 30/19 stranding, ACSR conductors.
c-l-c String, sag, and clip-in two 9/16-inch, EHS, copperweld overhead ground wires.
c-l-d Install vibration dampers on conductors and overhead ground wires as shown on Drawing No. 214-D-16638.
c-2 San Joaquin River Crossing — This crossing will be located approximately as shown on the General Location Map, Drawing No. 214-D-16790 and arranged as shown on Drawing No. 214r-D-16627. The total overall length of this crossing will be approximately 4,100 feet. The crossing will be made in three spans on four double-circuit steel towers — two suspension, and two dead-end — which will be erected by the Government under another contract. The main crossing span will be approximately 2,300 feet long and will be supported on two suspension towers, each approximately 335 feet high overall. The two anchor spans will each be approximately 900 feet long and will be dead-ended on anchor-type towers each approximately 120 feet high overall. The work required at this crossing will be identical in nature with that listed under subparagraphs c-l-a, c-l-b, c-l-c, and c-l-d above for the Sacramento River crossing.
*620 14. Suspension of work. The Government may at any time suspend the whole or any portion of the work under this contract but this right to suspend the work shall not be construed as denying the contractor actual, reasonable, and necessary expenses due to delays, caused by such suspension, it being understood that expenses will not be allowed for such suspensions when ordered by the Government on account of weather conditions or on account of the failure of Congress to make the necessary appropriations for expenditures under this contract.
22. Commencement, prosecution, and completion of work. The contractor shall begin work within twenty (20) calendar days after date of receipt of notice to proceed and shall complete all of the work within the following number of calendar days from the date of receipt of such notice: Schedule No. 1, three hundred and five (305) days; and Schedule No. 2, three hundred and sixty-five (365) days; Provided, That if award of contract for the work under Schedule No. 2 is made to a contractor other than the contractor awarded the contract for work under Schedule No. 1, notice to proceed for the work under Schedule No. 2 will be issued at the discretion of the contracting officer any time within two hundred and forty (240) calendar days for the work under Part I, and two hundred and seventy-five (275) calendar days, for the work under Part II, after date of award of the contract, and. the contractor under Schedule No. 2 shall complete ail work under Part I within one hundred and twenty-five (125) calendar days and all work under Part II within ninety (90) calendar days, from the date of receipt by him of such notice. Delays due to the operation of the national priorities system becoming effective subsequent to the date of the bid will be considered to be delays due to unforeseeable causes and beyond the control of the contractor. All required priorities for the performance of the work under these specifications shall be obtained by the contractor. The capacity of the contractor’s construction plant, sequence of operations, methods of operation, and the forces employed shall, at all times during the continuance of the contract, be subject to the approval of the contracting officer and shall be such as to insure the completion of the work within the specified period of time.
*****
29. Roads, interference with other work, and safety of the public. Access to the work from existing roads shall *621 be provided by the contractor and no payment will be made to the contractor by the Government for any work done in constructing, improving, repairing, or maintaining any road or structure thereon for use in the performance of the work under these specifications. The Government assumes no responsibility for the condition or maintenance of any road or structure thereon that may be used by the contractor in performing the work under these specifications or in traveling to and from the site of the work. Roads subject to interference by the work shall be kept open or suitable detours shall be provided by the contractor. During the period of time covered by this contract, the Government and others may be engaged in other construction work in the vicinity of the work, covered by these specifications. The contractor shall arrange and prosecute the work under these specifications so as not to interfere with other work or with existing improvements. The contractor shall provide, erect, and maintain all necessary barricades, suitable and sufficient red lights, danger signals and signs, and shall take all necessary precautions for the protection of the work and the safety of the public. Roads closed to traffic shall be protected by effective barricades on which shall be placed proper warning and detour signs. Ail barricades and obstructions shall be illuminated at night, and all lights shall be kept burning from sunset until sunrise. The cost of all work required by this paragraph shall be included in the prices bid in the schedule for the various items of construction work.
5. On the same date, May 31, 1950, the defendant entered into a contract with Ducanson-Harrelson Company for performing the work under Schedule No. 1. The erection of the steel towers for the two river crossings was under a contract with the Maceo Corporation.
6. Prior to entering into this contract, George W. Abbett, the president of plaintiff corporation, had been engaged in electrical contracting work since 1923. The plaintiff corporation had not, previous to the work under this contract, performed a line construction of this kind, although it had contracted for a part of a Shasta power line with the defendant. All work under that contract except the hauling of the material was sublet by plaintiff to others.
7. At the time of entering into contract, the transmission line was to cross the Sacramento River near Rio Yista in *622 Solano County to Sacramento County, and thence generally in a southern direction to the north shore of the San Joaquin Eiver, a distance of about 5 miles. The line then was to cross the San Joaquin Eiver into Contra Costa County and thence southerly to a point near Tracy Switchyard just over the Contra Costa-Alameda County line. The area lying between the Sacramento Eiver and the San Joaquin Eiver was low land, transversed by sloughs, which cut the unclaimed land into tracts, frequently referred to as islands. The land in these so-called islands was protected by levees against a rise in the water level. The land south of the San Joaquin Eiver over which the transmission line was planned was similar to this for about 8 miles.
8. Between the date of signing the contract here involved and June 2,1950, a combination of a high tide and a strong west wind caused a large flow of water in the San Joaquin Eiver. On the south side of the San Joaquin, levees protecting one of the so-called islands, known as the Webb tract, broke, causing that tract to be flooded to a depth of 10 to 12 feet.
Thereafter, the Bureau of Eeclamation began a study of changes that might be desirable to meet the new conditions. The levees on the Webb tract, which failed, were privately constructed and maintained, not being a part of any Federal or State project for reclamation or flood control. At the point of the break, the San Joaquin Eiver was about 1,800 feet wide. A deep water channel is located in the bed stream about 1,200 feet from the Webb tract levees. This deep water channel is a unit of a Federal navigation project on the San Joaquin Eiver. The presence of the deep water channel is not shown to have contributed to the levee break and the resulting flooding of the Webb and other tracts. The Corps of Engineers of the United States Army had during the past years made reconnaissance of the levees on the Webb tract, and noted the conditions of the levees due to poor maintenance. The fact of these surveys and the results reported were not known to the Bureau of Eeclamation officials when the line was routed over the low lands. The possibility of flooding had, however, been considered and the foundations for the transmission line towers had been designed to pro *623 tect them against damage caused by possible flooding of the low lands.
9. The Bureau in its restudy of the line route determined that the owners of the Webb tract did not plan to rebuild the levees promptly and that the existing water in that area was too deep for operation of trucks and other land equipment for the construction of the transmission line, and yet not deep enough for the use of barges for that purpose.
The Bureau decided to reroute the northern portion of the line covered by plaintiff’s contract. From the point near Rio Vista, west of the Sacramento River, the new route proceeded southwestward in Solano County to a point about five miles down the Sacramento River for a crossing.- In Sacramento County at the point of crossing, it was about 3 miles to the San Joaquin River where that river was to be crossed. The line of the new route lay over natural and not reclaimed low lands and while it needed levees for protection against high water, good levees were present..
The Bureau also changed the design of the towers, increasing the height of the concrete foundations so that the metal of the towers would be above high flood waters. The new alignment of the northern portion of the line made it necessary to negotiate for a new right-of-way over that portion of the line route.
10. Plaintiff having learned of the flood conditions, on July 26, 1950, wrote to the Bureau requesting the approximate location of rerouted lines and asking whether the river crossings were to remain as planned. It also asked for some idea as to the starting and completion time on the contract. Under date of July 28, 1950, the Bureau sent plaintiff a drawing showing the new routing of the line. The accompanying letter advised plaintiff that the river crossings were about the same length as those in the original plan with the same design of towers, and that drawings covering the towers for the river crossings and the other positions of the line would be forwarded in the near future. After furnishing other details the letter concluded:
It is estimated, by this office, that the tower erection for the Rio Vista-Tracy Section of the line will be well enough advanced to enable you to begin stringing opera *624 tions about October 1. It is estimated that the river crossing towers should be available for stringing approximately December 15. We will endeavor to inform you well in advance of the issuance of Notice to Proceed so that you may make your plans accordingly.
Changes in the contract for the river crossing towers were given to the Maceo Corporation on September 13, 1950 and changes in the contract for the line towers were given to Duncanson-Harrelson Co. on December 21, 1950.
11. By letter dated November 24,1950, the Bureau sent to plaintiff revised drawings covering the line as relocated and redesigned and concluded:
These plans cover the Rio Yista-Tracy Section and the Sacramento and San Joaquin River Crossing Towers as relocated and are transmitted to you for your information pending issuance of the Notice to Proceed. In your review of these plans, will you please note that access to the line is considerably improved over the original location and will be very favorable for your stringing operations.
Regarding our forecast, contained in paragraph 4 of referenced letter, that tower erection would be sufficiently advanced for you to begin stringing operations by October 1, 1950 on the Rio Yista-Tracy Section and by December 15, 1950 on the River Crossings, please be informed that these dates must now be advanced to March 1, 1951 on the Rio Yista-Tracy Section and to February 15, 1951 on the River Crossings. We will endeavor to inform you of any further change in the newly forecast dates in order that you may make your plans accordingly.
12. Under date of December 22, 1950, the Bureau of Reclamation wrote plaintiff as follows:
The provisions of Paragraph 22 of Specifications 2979 require that you be issued notice to proceed for the work under Schedule No. 2, Part I, within 240 calendar days after date of award of contract. Since your Contract No. 12r-19003 is dated May 81, 1950, this notice to proceed should be issued on or before January 26, 1951.
Due to the relocation of the line north of Station 10641+75, necessitated by the flooding of the Webb Tract, which has delayed work under Schedule No. 1 of subject specifications, we desire to withhold issuance of notice to proceed on Part I until June 1, 1951. Please advise us if this proposal meets with your approval.
*625 Plaintiff replied by letter dated December 27, 1950, stating:
In reply to your letter of December 22, 1950, we question an extension of time on the above contract, due to delays caused by the flooding of Webb Tract. The postponement will be satisfactory to us with the following provisions:
That the Bureau of Keclamation reimburses us for any additional costs that we might incur due to increased wages and working conditions demanded and awarded to the Local Unions having jurisdiction.
By letter dated January 25,1951, plaintiff was given notice to proceed with its work under Part I. This letter read, in material part, as follows:
Pursuant to the provisions of paragraph 22 of the specifications, you are hereby notified to proceed with the work covered by this contract. The date you receive this letter, as shown on the registry return receipt,_ will be the effective date in computing the time within which completion of the contract is required.
Inasmuch as the work covered by Schedule 1 of subject specifications is not sufficiently advanced for you to begin your stringing operations, it will be necessary for us to grant an extension of time for the completion of your contract. This delay will be made the subject of a Findings of Fact which will be issued at a later date.
Plaintiff received the foregoing letter on January 26,1951, and in response, plaintiff again stated that it felt it was entitled to an “extra”, covering cost due to delay.
By letter dated March 1,1951 and received March 2,1951, plaintiff was given notice to proceed with the work under Part II. This letter read as follows:
Pursuant to the provisions of paragraph 22 of the specifications, you are hereby notified to proceed with the work covered by subject contract.
Please acknowledge receipt of this Notice to Proceed. The date you receive this letter, as shown on the registry return receipt, will be the date used to compute the completion time under your contract.
Since erection of the towers for these crossings, which is being done by another contractor, is not sufficiently advanced for you to begin stringing operations, it will *626 be necessary for ns to grant an extension of time for the completion of your work. This delay will be made the subject of a Findings of Fact at a later date.
The last paragraph of each of the foregoing letters in effect constituted a suspension of both Part I and Part II of the contract work pursuant to paragraph 14 of the specifications.
Plaintiff was granted 217 days’ extension of time covering the period of suspension from January 27 to August 31, 1951, upon the determination of the contracting officer that “lack of erection of sufficient transmission line towers by another contractor prevented the contractor from commencing his stringing operations after receipt of notice to proceed, until September 1, 1951.” This extended the period for the completion by plaintiff of its work under Part I from May 31,1951, to January 3,1952.
13. By the middle of August 1951, the contractor who was erecting the towers had advanced sufficiently with his work that plaintiff’s stringing operations could be conducted without danger of interference between the two contractors. At that time, defendant’s representatives conferred with plaintiff about the fact that plaintiff could proceed on the stringing operations exclusive of the river crossings. The results of this conference were confirmed by a letter from defendant to plaintiff, dated August 21,1951, reading as follows:
Reference is made to our letter of January 25, 1951, received by you on January 26, 1951, which gave you a Notice to Proceed on Schedule 2, Part I, Specifications 2979. At that time, erection of towers was not sufficiently advanced for you to begin your stringing operations and you were advised that an extension of time would be granted from January 26 until such time as it was possible for you to begin this work.
On September 1, 1951 erection of steel towers will be far enough advanced so that you may begin work on this portion of your contract. You are, therefore, notified to begin work on or about September 1,1951. A Findings of Fact is being prepared which will grant you an extension of time from January 26, 1951 to September 1, 1951.
14. Under date of October 15, 1951, plaintiff was advised that the erection of the towers at the river crossings had *627 reached a point at which it could begin stringing operations on the river crossings. This letter read as follows:
Reference is made to our letter of March 1, 1951, received by your office on March 2, 1951, which gave you Notice to Proceed on Schedule 2, Part II, of Specifications 2979. At that time erection and painting of towers was not sufficiently advanced for you to begin your stringing operations and you were advised that an extension of time would be granted from March 2,1951 until such time it was possible for you to begin this work.
Erection of steel towers is now complete, and on October 22 the painting will be far enough advanced so that you may begin work on this portion of your contract. You are, therefore, notified to begin work on or about October 22,1951. A Findings of Fact is being prepared which will grant you an extension of time from March 2, 1951 to October 22, 1951.
Plaintiff was granted a time extension of 233 days, covering the period from March 3 to October 21, 1951, when “delay in completion of towers by another contractor prevented the contractor [plaintiff] from commencing his stringing operations after receipt of notice to proceed.” This extended the time for the completion by plaintiff of the work under Part II from May 31,1951, to January 19,1952.
15. After receiving the effective notice to proceed with Part I by September 1,1951, a further substantial period was necessary for plaintiff to mobilize labor, equipment, and materials before beginning work in the field. Plaintiff actually began field work on Part I about September 9, 1951, on the southern end of the line at Tracy, since tower erection had started at that end. Under the circumstances, this was within a reasonable time after the effective notice to proceed was issued.
Because of the delay in issuing an effective notice to proceed on Part I, plaintiff was unable to revamp the schedule of its operations and transfer a qualified experienced superintendent from some other contract to supervise this job. He was forced to employ an inexperienced superintendent on the job who was unable to get the work done at a rate necessary to meet the revised completion dates. Due to this fact, and because of the time necessary to mobilize its forces. *628 plaintiff was able to string only one mile of wire during September 1951.
16. About October 1, 1951, plaintiff was able to place a new superintendent on the job wlio performed adequately in supervising the work. With, adequate supervision available, plaintiff strung 11.094 miles of line in October. This was normal progress for such work.
17. Plaintiff continued at a similar rate of progress until about November 19,1951, when unusually heavy rains began. Due to these severe rainfalls, and the fact that a portion of the November work was performed over a low area containing sloughs and drainage canals, plaintiff’s labor was unable to work efficiently and equipment became bogged down with the result that the progress of the work was substantially reduced. Because of this condition, plaintiff strung only 7.299 miles of line during November 1951.
18. Throughout the remainder of the winter of 1951-1952, unusually severe rains, far above the seasonal norm for the area, continued. It was difficult to keep crews together because of the loss of working time due to weather, and also because of the cold, wet, muddy conditions at the site. Equipment was continuously becoming mired down in the mud. Plaintiff’s entire schedule for performing the work was disrupted by these conditions. The effects of the rainfall were aggravated by the high water table of the peaty soils between the crossings of the Sacramento River to Tracy. North of the Sacramento River to Rio Yista the line crossed higher ground, but the nature of the soil, adobe over hardpan, made operations in wet weather very difficult.
As a result of these conditons, plaintiff was able to string only 4.001 miles of line in December 1951. Also during this month plaintiff began the stringing of the river crossings. Plaintiff had assembled materials and equipment for this part of the work after receiving the effective notice to proceed by October 22, 1951, but had not been able to begin stringing because the labor on the job threatened to walk off if an additional crew was brought on to perform this work. This threat was made because plaintiff’s regular crew wanted the premium pay required to be paid for work on the *629 high towers of the river crossings, and did not want a fresh crew to receive these higher wages.
19. In view of the difficulties of working in this period of severe rainfall, plaintiff, in a letter of December 26, 1951, requested defendant’s permission to discontinue portions of the work until more favorable weather. Plaintiff followed this with a letter of January 7, 1952, requesting an extension of time for 60 days due to the unusually heavy rains and noting that its bid had been prepared on the basis that the work would not be performed in the winter.
By letter of January 14,1952, the Bureau of Reclamation refused to agree to plaintiff’s request for a stoppage of the work and stated that the request for an extension of time would be considered subsequently. The letter warned that liquidated damages might be incurred if the work was delayed or stopped. It was also “suggested” that plaintiff could expedite the work by securing a “qualified superintendent.” Plaintiff protested this action by a letter of January 16, 1952, to the Bureau, pointing out that the difficulty with its superintendent had been caused by the delay in issuing an effective notice to proceed. Plaintiff again called attention to its claim for additional costs arising from the delay in issuing effective notice to proceed.
20. Plaintiff continued with the work as best it could under the difficult conditions caused by the above-normal rainfall. Work on the San Joaquin River crossing was performed from approximately December 31, 1951, through January 27, 1952, and the Sacramento River crossing from about February 25, 1952, through March 30, 1952. The work on Part II, the river crossings, was complete and formally accepted by defendant on March 31, 1952. The work under Part I of the contract, the stringing of the transmission lines, was completed except for clean-up, by April 25,1952, and formally accepted by defendant on that date. The clean-up work was completed on May 11,1952.
21. Plaintiff’s equipment was adequate for the work under this contract. The crews employed by plaintiff were of average size and adequate to perform the work. Except during the initial stages of the work, plaintiff’s superintendents *630 were capable and no further delay to the job was occasioned by lack of adequate supervision.
The contracting officer by findings of fact of May 8,1952, extended plaintiff’s time for completion of Part I by 113 calendar days to the date of formal acceptance of this work, April 25, 1952, and extended the time for Part II by 72 calendar days to March 31, 1952, because of the abnormal amount of rainfall encountered.
22. The plaintiff, by letter of May 23, 1952, submitted to the contracting officer a claim for additional compensation in the amount of $53,335.13 for added costs due to the delay in issuing the notices to proceed. By findings of fact of July 23, 1952, the contracting officer denied plaintiff’s claim.
Except for an item in the amount of $714.54 claimed by plaintiff as extra costs incurred in the maintenance and repair of an access road which the contracting officer held to be plaintiff’s responsibility, the claim was denied on the basis that the claim was one for unliquidated damages for delay, which the contracting officer had no authority to entertain or settle.
Within 30 days from the disallowance of its claim by the contracting officer, plaintiff appealed to the Secretary of the Interior. The solicitor of the Department of the Interior, acting under authority delegated by the Secretary of the Interior, on May 26,1953, affirmed the contracting officer’s decision denying plaintiff’s claim as being a claim for unliquidated damages for delays and beyond the authority of the head of the Department to determine.
The defendant’s delay in issuing effective notices to proceed resulted in performance of the work in a period when plaintiff was obliged to pay increased rates of wages for labor.
This delay also caused plaintiff to perform the work in the winter rainy season with resultant loss of efficiency of labor and equipment.
23. The plaintiff’s claim consists of increased wages paid its employees over and above the rates prevailing during the performance period originally scheduled, and increased costs by reason of deficiency in performance by both labor and equipment employed on the job. Claim is also made *631 for the cost of repairing a private road which was damaged by plaintiff’s trucks.
There is no evidence that plaintiff incurred any additional cost by reason of the suspension of Part I of the work until September 1,1951, and Part II until October 22,1951, and no claim is made for such delay.
24. On May 29, 1951, the California-Nevada Line Constructors’ Chapter of the National Electrical Contractors’ Association, Inc., entered into an agreement with the San Francisco Local Union 1245 of the International Brotherhood of Electrical Workers, effective June 16,1951. Local No. 50 of Oakland, as well as other local unions of northern California, participated with Local No. 1245 in this agreement in order to establish uniform rates and working conditions for all outside electrical workers in that area. The rates of compensation provided therein compare with previously established rates in an agreement with Local No. 50, as follows:

The agreement, effective June 16,1951, as well as the prior agreement provided that employers would furnish transportation and pay for travel time from shop to job, job to job, and job to shop within the jurisdiction of the union.
Both the 1951 agreement as well as the prior agreement provided double time for work on Saturdays, Sundays, holidays, and for work in excess of eight hours a day. Double time was also specified for work on towers over 80 feet high under the prior agreement and for work on steel towers over 100 feet high in the 1951 agreement.
The prior agreement provided for a reasonable allowance for out-of-town expenses of four dollars per day per man for a seven-day week as a minimum amount, whereas the 1951 agreement provided five dollars a day per man for actual working days.
*632 The plaintiff employed men from Local No. 1245 and paid the foregoing rates effective June 16, 1951, throughout its performance period.
25. The plaintiff paid increased wages as follows:

The plaintiff regularly paid as travel expense a per diem allowance of five dollars on a five-day week basis. There was no actual increase in travel expenses paid.
The double time paid under Part II included both regular overtime work and double time for work on towers in excess of 100 feet over the river crossings.
26. The plaintiff claims that travel time paid on work performed north of the San Joaquin River, as well as the premium time paid for work on the towers over the river crossings, represent increased costs because of waivers issued by Local 340 of Sacramento having jurisdiction over that area. The plaintiff failed to furnish any substantial evidence in support of this claim and admitted that there was no written waiver of the rights of union employees to receive travel pay and premium pay for work on high towers.
On the contrary, the Sacramento Line Agreement between the Sacramento Valley Chapter of the National Electrical Contractors Association, Inc., and Local Union 340 of Sacramento, provides for travel pay, double time for all overtime, and double time for work on wooden towers over 80 feet in height with a minimum of one-half day of such premium pay for any work of 30 minutes or more on such towers. An amendment to the said agreement, effective April 1, 1951, *633 provided increased rates in the following classifications of line workers:
General foreman-$3.25
Foreman_ 3.00
Journeyman_ 2.75
Equipment operator. 2.75
Groundman_ 2.06
Had the plaintiff employed workers from Local 340, it would have had to pay the above rates during part of the originally scheduled performance period commencing April 1,1951. It was a long standing policy that one local would' control an entire job. Most of the line strung by the plaintiff was within the area covered by the jurisdiction of the San Francisco-Oakland unions.
27. The plaintiff claims increased costs of work performed during the rainy season from December 1951 through March 1952, as measured by the proportion of the line strung during the months of September through November 1951 and April 1952, which were considered “normal periods and comparable to the period of performance under the original schedule.”
The climatological data compiled by the U. S. Weather Bureau reported rainfall at Bio Vista, the northern end of plaintiff’s work, and the average monthly temperature at the-Sacramento Airport for the months of performance, as follows:

28. The plaintiff’s contract was awarded upon its bids of $79,210 for stringing steel reinforced aluminum and copper conductors over 24 miles under Part I of Schedule 2 work *634 and $33,467 for the stringing of crossings over the San Joaquin and Sacramento Rivers. The rerouting of the line increased the overland mileage to approximately 26.2 miles which increased the total contract price to approximately $120,000. The actual payments to the plaintiff are not established by the evidence.
There were constructed about four towers per land mile on which the lines were strung, and four towers for each crossing, one each side and two in midstream. The river crossings were approximately 3,000 feet over the San Joaquin and 3,800 feet over the Sacramento.
The land mileage, as estimated by the Bureau of Reclamation for partial payment vouchers, was 19.393 miles from the Tracy Switchyard at the southern end to the San Joaquin River, 2.796 miles over the Sherman Island section lying between the San Joaquin and Sacramento Rivers, and 4.001 miles from the Sacramento River to the Rio Yista connection at the north end.
The southern portion of the line up to the San Joaquin River was generally high and dry, except that portion immediately south of the river which was included in plaintiff’s November 1951 estimate. In its claim of May 23, 1952, the plaintiff states: “The reason the November mileage was lower than that in October was because that particular section had more sloughs, wet ground, drainage canals, and dead ends than any other section of the line covered.” The Sherman Island section between the rivers was low peat land and the water level was kept approximately one foot below the surface by constant pumping. The line north of the Sacramento River to the Rio Yista connection was quite high, extending over a bluff, but the soil consisted of adobe over hard-pan and was unstable when wet.
29. The plaintiff operated with one crew throughout its performance. The crew, employed in stringing the southern portion of the line up to the San Joaquin River averaged about 31 men but beginning in December 1951, the crew averaged between 18 and 25 men.
The plaintiff’s cost of performing its contract work is summarized by periods in the following table:

*635

The actual hours for which premium pay at double time rates were made represent 5 percent of the total hours for the period from September through November 1951, 4 percent in December 1951, 20 percent for February, and 10 percent in April 1952, all Part I work, 31 percent for January 1952, on the San Joaquin crossing, and 41 percent for March 1952 on the Sacramento crossing.
The premium time for stringing conductors across the rivers included work performed on high towers, but there was no evidence submitted that any of the towers over the Sherman Island section between the rivers exceeded 100 feet in height, which would require premium pay. Since this section of the land line was strung in February 1952, with rainfall of only 1.36 inches, less than one-half of the normal for that month, it is reasonable to conclude that this section of the land line involved more difficult and costly installations than other portions of the line.
The performance of Part I work in April 1952 consisted of clean-up work and stringing areas which had been left open as the earlier work progressed by reason of weather conditions, material shortages, and highway and railroad crossings which required permits that had not been received in time to continue such crossings. No additional mileage *636 was claimed for April 1952 work and it is reasonable to conclude that no deduction was made for these open areas in the mileage previously included in pay estimates.
30. The plaintiff , claims that 32.48 percent of its cost of stringing Part I work during December 1951 and February 1952, represents inefficiency of its labor in performing the work during rainy weather. This percentage was then applied to its labor costs, after excluding wage increases otherwise claimed, for both Part I and Part II of its work performed during the rainy season and also to its equipment costs for the same periods.
In determining its normal costs for Part I work, the plaintiff took its total labor costs for the period September 3 to December 2,1951, covering the stringing of 19.393 miles, and added a portion of its costs from March 31 to May 14, 1952, in completing this portion of the line and clean-up work. The costs so determined amounted to $60,833.65. On the premise that the mileage strung represented 73 percent of the total of Part I work, the total normal costs would be $83,333.76 (60,833.65 X 100-^73), and that the remainder of Part I work should cost $22,500.12 (27 percent of 83,333.76). The actual cost of completing Part I work was $33,326.49, or $10,826.37 in excess of plaintiff’s computed amount, which represents 32.48 percent of such additional costs.
The additional costs of $33,326.49 included $6,319.07 of costs incurred during the period April 6 to May 11, 1952. There is no satisfactory evidence that any part of such costs was incurred during any period of abnormal rainfall, nor that any part thereof was even applicable to the mileage strung in December 1951 and February 1952, north of the San Joaquin Eiver. On the contrary, the evidence indicates that the work performed in April 1952 was to fill in open spaces south of the San Joaquin Eiver and clean-up work.
By eliminating the $6,319.07 from costs of performing the 6.797 miles of line during the rainy season, the total costs would be ($33,326.49 — $6,319.07) $27,007.42 and the excess cost would be ($10,826.37-$6,319.07) $4,507.30, or 16.69 percent of such costs.
By adding this sum of $6,319.07 to normal performance with reported costs of $60,833.65, the total cost of performing *637 the 19.393 miles would be $67,152.72, and on this basis the total cost of stringing the entire line would be $91,990.02 ($67,152.72X100-f-73). The actual cost of performing Part I work was $94,160.14.
31. There were substantial variations in the performance other than conditions brought about by abnormal rainfall, both in the amount of overtime paid at double times rates and in the general condition of the terrain over the areas of the line. The performance in hours, corresponding to the cost basis in finding 30, shows the following results:

The best performance in respect to mileage strung was in December 1951 when the rainfall totaled 5.14 inches, and the poorest performance was in February 1952 when the total rainfall was only 1.36 inches or less than one-half of normal. This denotes substantial variation in the condition of the terrain and probable improper allocations of costs between the San Joaquin River crossing and the land line between the rivers. The plaintiff contends that the low slough area south of the San Joaquin River strung in November 1951 was comparable with the low areas between the rivers which was strung in February 1952, and based its claim on the premise that the portions of the line strung during September through November 1951 were comparable to the portions strung in December 1951 and February 1952.
32. By eliminating the work performed in April 1952, in finishing the 19.393 miles of line from Tracy to the San Joaquin River, the performance on this line during the period *638 of September through November 1951, required 14,204.5 hours, or an average of 732.46 hours for each mile strung. On the same basis the 6.797 miles of line strung north of the San Joaquin River would require 4.978% hours. The actual hours employed and allocated to the stringing of the 6.797 miles were 6,038% hours, or an excess of 1,060 hours representing 17.55 percent thereof.
The plaintiff’s labor costs were $5,877.56 for December 1951 and $11,301.63 for February 1952, or a total of $17,179.19 after eliminating the wage increases reported in finding 26. Applying the 17.55 percent thereto gives the sum of $3,014.95. The applicable payroll taxes and insurance amounts to $384.86, and the total is $3,399.81.
The plaintiff paid per diem travel allowances of $1,385 in December and $2,125 in February, or a total of $3,510. By applying the 17.55 percent to this sum gives $616.01. The maximum amount of increased labor costs that may be reasonably attributed to poor working conditions and increased costs by reason of deficiency in performance during the rainy season is the sum of $4,015.82.
33. The plaintiff also claims increased costs by reason of loss in efficiency in stringing the crossing under Part II of its work, but has submitted no substantial evidence of any increased cost in the performance of this work during the rainy season. While the abnormal rainfall did hinder and delay the operations of the equipment in delivering the reels of cable along the land line, there is no evidence that the flow of the rivers was increased to the extent of substantially increasing the stringing of conductors over the crossings. The plaintiff allocated 8 hours of regular work and 2 hours of overtime for an equipment operator on the crossing of the San Joaquin River, and 116 hours of regular work and 36 hours of overtime for equipment operators on the crossing of the Sacramento River. The total cost of equipment operators was $500, in a total of $25,367.90 wages paid for installing the lines over the rivers.
It is determined that plaintiff incurred no increased costs by reason of stringing the crossings during the rainy season.
34. Plaintiff also claims 32.48 percent of its equipment expense, representing alleged loss of efficiency suffered by the *639 use of the equipment during the rainy season. The plaintiff computed its equipment expense at the actual cost of rented equipment and at 10 percent of the cost per month for equipment owned.
The plaintiff owned the following described equipment:

In addition to the above equipment, the plaintiff rented a transit, presses, stringing sheaves and a Ford pick-up truck for use in stringing the land lines at rates totaling $762 per month.
Plaintiff also rented a bull wheel, stringing sheaves, winches and a loading crane for use in stringing the crossings at monthly rates totaling $1,074.06 per month.
35. A fair and reasonable monthly expense for plaintiff’s equipment, other than the special facilities costing $4,390, employed in stringing the crossings is $1,500.72.
The plaintiff incurred additional equipment expense consisting of $2,035.12 for fuel and $3,118.78 for repairs, of which $2,674.79 was allocated to Part I, stringing of the land line. This work covered periods of approximately six months resulting in an average monthly cost of $445.80.
The total monthly equipment expense in stringing Part I work, consisted of equipment expense of $1,500.72, equipment rented of $762.00, and fuel and repairs of $445.80, and for the two months of December 1951 and February 1952, which work was performed during the rainy season. Such *640 costs were $5,417.04. The deficiency of performance, represented by 17.55 percent thereof, would be $950.69.
There is no satisfactory evidence that the plaintiff suffered any deficiency in performance in stringing crossings.
36. The plaintiff claims costs for road repair work during the rainy season, and submitted invoices totaling $649.58. These invoices consist of the moving of plaintiff’s caterpillar tractors, TD-9 and TD-14, between the tower at Dozier Ranch, Rio Vista, Sherman Island, and Jersey Island headquarters, and the delivery of some rock to Dozier Hi Tower and some to unspecified areas.
Paragraph 29 of the specifications reads in part as follows:
Access to the work from existing roads shall be provided by the contractor and no payment will be made to the contractor by the Government for any work done in constructing, improving, repairing, or maintaining any road or structure thereon for use in the performance of the work under these specifications.
In denying this claim the contracting officer found that “The contractor elected to use a private farm road, located off the transmission line right-of-way, and the costs incurred are for maintenance and damages paid to the property owner for the right to use this private road.”
The plaintiff has submitted no substantial evidence that the finding of the contracting officer was erroneous, nor to support this item of the claim against the defendant.
37. The plaintiff sustained increased costs, reasonably attributable to the delays on the part of the defendant, in the sum of $8,507.75 for wage increases (finding 25), $4,-015.82 for the deficiency in performance of labor (finding 32), and $950.69 for the deficiency in the employment of equipment during the rainy season (finding 35), the total of these amounting to $13,474.26.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States thirteen thousand four hundred seventy-four dollars and twenty-six cents ($13,474.26).

 Except for an item in the amount of $714.54 claimed by plaintiff as extra costs incurred in the maintenance and repair of an access road -which was held to be plaintiff’s responsibility. Plaintiff submitted no substantial evidence that the finding of the contracting officer was erroneous or to support this item of the claim against the defendant.

 The manner in which we have interpreted that decision is revealed in the case of Cauldwell-Wingate Co. v. United States, 109 C. Cls. 193, involving a claim based on the Government’s alleged delay in making a work site available to plaintiff. At page 221 this court said:
“But, even though there may have been some delay in the delivery of the buildings, plaintiff would not be entitled to recover under the decision of the Supreme Court in United States v. Foley Co., 329 U. S. 64. The defendant did not agree to deliver the buildings on any specific dates." [Emphasis supplied.]