Opinion

per curiam:

This is a suit for increased costs under a Government contract. The increased costs are -claimed to have resulted from delays occasioned by the defendant’s failure to give effective notice to proceed, as required by the terms of the contract.
The facts upon which plaintiff relies are substantially the same as those in the case of Abbett Electric Corporation v. United States, 142 C. Cls. 609. In that case, as in the present case, the contract provided a time in which notice -to proceed would be issued. In the Abbett case, as in this -case, notice to proceed was issued by letter which included notice of suspension of the work under the contract. In this climate we held in the Abbett case that the Government had breached the contract by not giving an effective notice to proceed, and that the costs occasioned by the delay growing out of the breach should be borne by the Government.
We now adhere to our former ruling and hold the Gov-ernment breached the instant contract. As a result, plaintiff was delayed and suffered increased costs in the amount ■of $14,547.48, for which it should recover in this action, and judgment will be entered in this amount.
It is so ordered.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner W. Ney Evans, and the briefs and .argument of counsel, makes findings of fact as follows:
, 1. Among the installations of the Central Valley Project ■of California are the Shasta Dam, in the upper reaches of the Sacramento Diver, and the Tracy Pumping Plant, near the mouth of the river. Shasta Dam includes a plant for the generation of electricity. Two transmission lines (described in the evidence as the east side line and the west side line) ■carry electric power from Shasta to Tracy. The instant case *401 is concerned with a contract for stringing the wires on towers over a section of the west side line.
2. Separate contracts were made by the Bureau of Reclamation for the manufacture of the towers, for some of the materials to be used in setting up the towers and transmission lines, and for the erection of the towers and the stringing of the wires.
The invitation for bids for the manufacture of steel towers and appurtenances[1] for the west line was issued on September 2, 1949. After some delay for refinements in specifications and checking quantities, the opening of bids was set for October 18,1949, and a contract (dated November 15, 1949) was made with a San Francisco steel manufacturer. Deliveries under the contract were to begin in March 1950, and, as far as material here, were to be completed by July 15, 1950.[2]
3. Invitations for bids for the erection (including the stringing of wires) of the west side transmission line were issued during the early months of 1950. The work was divided among geographic sections, of which the contract in suit (for 42 miles of the line) was an example.
These contracts for the erection of the line were offered to bidders in two schedules. Schedule 1 called for the erection of the towers. Schedule 2 called for stringing the wires. Bidders were permitted to bid on either schedule, singly, or on both schedules together, for the section of the line offered.
For the section involved in this suit, extending from Madison to Rio Vista (and sometimes hereinafter referred to as the Madison-Rio Vista section), separate contracts were made for the two schedules. The contract for the erection of the towers (dated March 8,1950) was awarded to an individual (James H. McFarland) who is hereinafter referred to as McFarland.[3]
*402 4. Part of the east side line had been erected in 1949 and some of it was under construction in 1950. Before the contract described in the preceding finding was made (on March 8, 1950), plaintiff had become the subcontractor for stringing wires on two sections of the east side line and was already at work on one of them.
The section on which plaintiff was at work extended for a distance of approximately 55 or 60 miles, from Elverta to Oroville.[4] The towers on that section had been erected in 1949. Plaintiff began the stringing of wires in early 1950 and worked on through the spring, completing the work in the summer.
The second section on which plaintiff held the subcontract for stringing the wires was another 55- to 60-mile stretch from Perkins to Tracy.[5] When plaintiff finished the El-verta-Oroville section in the summer of 1950, it moved its men and equipment to the Perkins-Tracy section, and completed that work early in January 1951.
Meanwhile, plaintiff was negotiating for the subcontract on the 18-mile strip between Elverta and Perkins.[6] The negotiations culminated in November 1950 with a subcontract for this section, thereby giving plaintiff responsibility, under subcontracts, for stringing the wires over the entire distance (128 to 138 miles) from Tracy to Oroville.
The Madison-Bio Vista section of the west side line was 25 or 30 (air) miles from the Elverta-Perkins and Perkins-Tracy sections of the east side line.
5. Notice to proceed was issued to McFarland on March 28, 1950. His contract called for completion within 340 days from March 29, 1950, or on or before March 4, 1951.[7]
6. By the contract in suit, dated April 11, 1950, plaintiff undertook to “* * * furnish the materials, and perform the work for stringing conductors and overhead ground wires, under Schedule No. 2 * * * for 230-kilovolt lines * * * *403 Madison-Rio Vista Section * * * for tbe consideration of payments to be made to the contractor at the unit prices stated in said schedule, in strict accordance with the specifications, schedules, and drawings * * The contract further provided that “the work shall be commenced and shall be completed as provided in paragraph 22 of Specifications No. 2883.” [8]
7. (a) The contract contained many of the standard articles of Government contracts, such as those relating to Changes, Changed Conditions, and Extras (Articles 3,4, and 5), Delays (Article 9), Other contracts (Article 13), and Disputes (Article 15). The contract is in evidence as plaintiff’s Exhibit No. 1, and is incorporated herein by reference. Of the articles listed above, only the last three are deemed material here.[9]
(b) Article 9 (Delays — Damages) provided for the payment of liquidated damages[10] by the contractor for failure to complete the work within the specified time, and qualified the requirement by providing that the contractor should not be charged with liquidated damages “because of any delays * * * due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God * * * acts of the Government, acts of another contractor in the performance of a contract with the Government, * * * and unusually severe weather * *
(c) Article 13 (Other contracts) specified that the “Government may award other contracts for additional work, and the contractor shall fully cooperate with such other contractors and carefully fit his own work to that provided under other contracts as may be directed by the contracting officer. * * *”
(d) Article 15 (Disputes) contained the usual provision that “* * * all disputes concerning questions of fact arising under this contract shall be decided by the contracting *404 officer subject to written appeal * * * to the bead of the department * *
8. (a) The specifications were annexed to the contract. The provisions of five of the paragraphs of the specifications are material here (paragraphs 3, 14, 18, 22, and 24) ,[11]
(b) Paragraph 3 of the specifications provided that the Government would “* * * provide the right-of-way or the site for permanent works or installations * *
(c) Paragraph 14 of the specifications provided that the Government might at any time suspend the whole or any portion of the work but that “* * * this right to suspend the work shall not be construed as denying the contractor actual, reasonable, and necessary expenses due to delays, caused by such suspension, it being understood that expenses will not be allowed for such suspensions when ordered by the Government on account of weather conditions * *
(d) Paragraph 18 of the specifications recited that pursuant to the provisions of the Davis-Bacon Act the Secretary of Labor had determined “the prevailing rates of wages for the classifications specified in the locality of the work” and provided that the rates so determined (and as listed, by classification) “shall be the minimum rates per hour to be paid for the work * *
(e) Paragraph 22 of the specifications provided (under the conditions existing here, namely, separate contracts for Schedules 1 and 2) that “* * * notice to proceed for the work under Schedule No. 2 will be issued at the discretion of the contracting officer any time within * * * 280 calendar days after date of award of the contract, and the contractor under Schedule No. 2 shall complete all work thereunder within * * * 120 calendar days from the date of receipt by him of such notice. * * *”
(f) Paragraph 24 of the specifications required the contractor to furnish to the contracting officer, within 30 calendar days after date of receipt of notice to proceed, a complete construction program, and further to submit revised construction programs at intervals of not more than 6 months.
9. (a) In May 1950, McFarland submitted to the Bureau *405 of Beclamation a construction schedule wherein his work on the Madison-Bio Vista section was divided into 14 segments or items, including clearing (item 1), excavation (items 2-5), drilling (item 6), cement and footings (items 7-10), erecting towers (item 11), and placing miscellaneous ground installations (items 12-14). The schedule indicated that he contemplated completion, by the end of August 1950, of all items except the erection of towers, as to which the percentages of completion were scheduled as follows:
Month: Percentage
June (1950)_ 2
July- 8
August_ 15
September_ 20
October_ 20
November_ 15
December_ 15
January (1951)_ 5
(b) The foregoing schedule was transmitted by the Construction Engineer to the Chief Engineer of the Bureau of Beclamation on May 28, 1950, with the comment that “the proposed construction program * * * seems feasible unless circumstances of an unforeseen nature prevent completion as programmed.”[12]
(c) McFarland’s projection of two percent completion of tower erection in June 1950 indicated that he expected to begin hauling the fabricated components of the towers to their sites during that month.
10. (a) Deliveries of the steel stub angles for the Madison-Bio Vista section had been scheduled by the Bureau of Eecla-mation (in its contract with the steel manufacturer: finding 2) to begin in May 1950, with tower bodies to follow in June, all steel for the section to be delivered by July 15.
*406 (b) Prior to May 1950, the steel manufacturer had delivered other components of its contract in carload lots, with some components delivered a month or more ahead of the completion date and the final shipment delivered on time.
(c) With respect to the steel intended for the Madison-Bio Yista section, the manufacturer delivered the stub angles on schedule, but ceased making deliveries of the tower bodies in carload lots.[13] The manufacturer further failed to meet the July 15 delivery date, but delivered all of the towers due at that time in one trainload on July 26, 1950.
(d) When the steel arrived at the storage yards of the Bureau of Eeclamation, it was unloaded, sorted, inventoried, and stored for issuance to the contractor (McFarland)* This process was completed on or about August 22, 1950, and McFarland was promptly advised that the steel was available. Prior thereto, no tower bodies had been available to McFarland for the Madison-Bio Yista section.
11. (a) On September 23, 1950, McFarland submitted to the Bureau of Eeclamation a schedule of work to be performed “under Item No. 11” (erection of tower bodies) showing anticipated completions in terms of the number of towers. In the table below this schedule has been summarized in the first two columns. The third column translates the number of towers into percentages of completion, while the fourth column lists, for comparison, the percentages of completion projected in the May schedule.[14]
Number of Towers Percentages September May 9.5 15.8 47.3 27.4 65 16 15 5 Month October (I960)— November.. December. January 20, 1951.
(b) The Bureau thereupon asked McFarland for a complete revision of his construction schedule. He forwarded it on October 17, 1950. The revised construction schedule *407 showed that as of the end of August, the following items had been completed: all excavation and drilling (items 2-6); all concrete work with reinforcement bars and steel stubs in place (items 7-10); and the placing of tower ground rods (item 12). The work remaining to be done included: (1) clearing (which the schedule indicated would be completed by January 31, 1951); (2) miscellaneous ground installations (items 13 and 14, to be completed by the end of October 1950); and (3) the erection of the tower bodies (item 11, to be completed by mid-January 1951).
(c) The Construction Engineer forwarded the revised construction schedule to the Chief Engineer of the Bureau of Reclamation on October 25, 1950, with the comment that “the proposed construction program seems feasible for accomplishment, unless circumstances of an unforeseen nature prevent completion as programmed.”[15]
12. (a) McFarland’s revised construction schedule indicated his intention to begin hauling the steel for the tower bodies in September 1950. The hauling was begun at that túne.
(b) McFarland’s plan was to begin the erection of towers at or near the town of Dixon, and to work south. Such a beginning would have resulted in dividing the section into two parts, the strip from Dixon south to Rio Vista comprising approximately three-fifths of the total length of the section. .
(c) The reason for the planned division was the existence of rice fields in the northern ten miles of the section. These rice fields were inundated in April or May of each year, and remained under water until sometime in September. The fields were then drained and the grain was harvested. Within a week or ten days after the water was drained from the fields the ground was firm enough to permit the movement of equipment and supplies for the work to be done by either McFarland or plaintiff.
*408 13. (a) In the area of California here involved, the rainy season begins about the middle of November and ordinarily extends through December and into January. The season arrived on schedule in 1950, but with heavier rains than usual. The hard rains continued longer than usual, ending early in March.
(b) The terrain immediately north of Rio Vista is rolling, and for the remainder of the distance to Madison it is sloping. The soil throughout the section is clay, with an underlayer of impervious hardpan. The rains of late November and early December 1950 so saturated the clay soil as to make movement over it almost impossible.
(c) McFarland persevered with efforts to erect the towers, but was able to complete only four or five by the end of December, when he ceased operations to wait for better weather and soil conditions.
14. Plaintiff, meanwhile, was working on the east side line, where the soil was sandy loam and not so affected by the rains as the clay on the west side line. Having completed the work on the Oroville-Elverta section during the summer of 1950, plaintiff had moved its men and equipment to the Perkins-Tracy section, and completed the work there early in January 1951. The men and equipment were then moved to the Elverta-Perkins section, and that work was completed about the middle of May 1951.
15. (a) On December 22,1950, the Construction Engineer of the Bureau of Reclamation wrote to plaintiff:
The provisions of paragraph 22 of [the] Specifications * * * require that you be issued notice to proceed for the work under Schedule No. 2 within 280 calendar days after date of award of contract. Since your contract * * * is dated April 11, 1950, this notice to proceed should be issued on or before January 16, 1951.
Due to work under Schedule No. 1 * * * being delayed, we desire to withhold issuance of notice to proceed until May 1, 1951. Please advise us if this proposal meets with your approval.
(b) On January 5, 1951, plaintiff’s president acknowledged receipt of the foregoing letter and advised the Construction Engineer that they could discuss the matter in Elverta in the near future, which he would prefer to do before making formal reply. The letter added:
*409 * * * Several questions are involved. One is the additional cost which will be incurred on account of anticipated increase in wage rates. Another involves the expense of disbanding our organization and storing equipment.
As you know we are nearing completion on the Perkins-Tracy section and it is our desire to continue with the same force and equipment on the Elverta-Perkins section but we may not be able to do this on account of the delay in the installation of foundations and erection of towers on that job.
(c) The evidence is silent as to any further communications between plaintiff and the Construction Engineer until the latter’s letter to plaintiff under date of January 15,1951, as follows:
Reference is made to your letter of January 5, 1951, * * *.
Pursuant to the provisions of paragraph 22 of the specifications, you are hereby notified to proceed with the work covered by this contract. The date you receive this letter, as shown on the registry return receipt, will be the effective date in computing the time within which completion of the contract is required.
Inasmuch as the work covered by Schedule 1 * * * is not sufficiently advanced for you to begin your stringing operations, it will be necessary for us to grant an extension of time for the completion of your contract. This delay will be made the subject of a Findings of Fact, which will be issued at a later date.
(d) On February 9, 1951, plaintiff wrote to the Bureau of Reclamation:
Reference is made to your letter of February 6, 1951, requesting that we make acknowledgment of your Notice to Proceed in connection with the above job which we received on January 16,1951.
You may consider this letter as our formal acknowledgment of your Notice to Proceed on January 16,1951. It is our understanding, however, that the work covered by Schedule 1 * * * is not sufficiently advanced for us to begin stringing operations and that an extension of time will be granted at some later date after it has been determined our work is ready to proceed.
16. McFarland resumed work in late March 1951. Instead of proceeding south from Dixon, he began at the northern *410 end of the line, to get through the rice fields before their inundation.[16] During the first three weeks of April, 44 towers were erected. A week followed in which no towers were constructed. Between May 12 and June 2, 41 towers were constructed, and by July 21 the number had reached 188, just two short of the full quota of 190. The last two were constructed in August.
17. (a) On May 28, 1951, the Acting Construction Engineer of the Bureau of Reclamation wrote to plaintiff:
. Deference is made to our letter dated January 15,1951, giving you notice to proceed on the above contract. Notice was received by you on January 16,1951. Reference^ also made to your letter of February 9,1951, concerning delay on stringing operations under subject contract.
The work covered by Schedule No. 1 * * * has now .progressed, sufficiently for you to proceed with the stringing operations. The delay between January 16, 1951, date on which you received notice to proceed, and May 28, 1951, will be made the subject of a Findings of Fact for extension of time for completion of Schedule No. 2.
(b) On June 6,1951, plaintiff replied:
This will acknowledge receipt of your letter of May 28,1951,.* * *
We wish to go on record at this time that while we have started the wire stringing operations, the tower erection has not advanced sufficiently for us to continue the wire stringing operations at a normal rate and we have found it necessary to restrict our progress accordingly. This involves delay and extra expense which we trust will be given consideration at the proper time.
(c) On July 11,1951, defendant’s Contracting Officer forwarded to plaintiff his findings of fact “pursuant to Article 9 of the contract” relating to delays from January 17 to May 27, 1951, wherein he found that the contract work was delayed for 181 calendar days because of “lack of erection of sufficient transmission line towers by another contractor”; and that this delay “was due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, and is, therefore, excusable under * * * Article 9 * * There followed a formal extension of time of 131 *411 days, placing the completion date on September 24, 1951.
18. (a) Plaintiff, having completed the Elverta-Perkins section of the east side line on May 15, 1951, moved its men and equipment to the Madison-Rio Vista section of the west side line and began the contract work at or near Dixon, working south (the rice fields having been inundated by that time). The 82-mile section south of the rice fields was completed by plaintiff on August 23, 1951. There was no more that could be done until the rice fields were drained.[17]
(b) Plaintiff resumed work, to complete the northern ten miles of the section, early in November.[18] The rainy season arrived on schedule around the middle of that month, but the rains (in 1951) were no heavier than normal until near Christmas time. Plaintiff made satisfactory progress during November and the first three weeks of December. With a crew as large as had theretofore been used by plaintiff, the work could have been completed in that time. About Christmas the rains became much heavier and continued so for several weeks.
(c) By the time the heavy rains began, plaintiff had completed the work except for three spans which required a special crossing over the transmission lines of the Pacific Gas and Electric Company. The heavy rains continued until toward the end of January. Plaintiff worked on the crossing in spite of the rain and completed the work on January 25,1952.
19. In relation to the McFarland contract the Contracting Officer, on October 19, 1951, entered findings of fact excusing all delays and extending the completion date accordingly.
20. On December 11,1951, the Contracting Officer entered further findings of fact pertaining to plaintiff’s contract in *412 relation to delays occurring after May 27 and prior to November 4, 1951.[19] Pertinent portions of the findings follow. * * * * *
By letter dated August 7, 1951, the contractor gave notice of delay due to (1) reduced progress and efficiency caused by the lack of completed steel towers * * * and (2) the flooding of approximately 10 miles of right-of-way * * * crossing rice fields which prevented the contractor from entering these lands to perform stringing operations. Only delays due to these causes through November 4,1951, will be considered herein.
* * * Following the severe weather period, the erection contractor resumed erection of towers on April 3, 1951, and utilized all his men and equipment to complete towers * * * lying within the rice areas before they were flooded on April 23, 1951. These areas were then made inaccessible to construction operations until harvest of the rice crop was completed on November 4,1951. The erection contractor * * * then proceeded to erect towers on footings for the remaining portion of his contract. By May 28,1951, it was considered that sufficient towers liad been erected to commence the stringing of conductor and overhead ground wire and the contractor began this work on May 28,1951. However, due to the nature of the work, he soon caught up with the tower erecting contractor and was forced to reduce his progress to that permitted by the progress made by the erection of towers. He was able to do this with approximately one-half the normal size crew which resulted in one-half the normal rate of progress. All stringing operations, with the exception of the portion within the rice areas, were completed by the contractor on August 23, 1951, 88 calendar days after commencing work on May 28,1951. It is determined that the contractor’s progress during this period was reduced to 50 percent normal efficiency or by 44 calendar days due to the lack of sufficient transmission line towers erected by another contractor.
Having completed on August 23, 1951, all work on towers that were accessible to him, the contractor was then forced to cease all operations entirely until the rice crop was harvested and he was permitted to enter these areas. The records kept in the project field office show that the harvest of the rice crop was completed on November 4,1951. It is determined that the contractor was *413 delayed 73 calendar days during the period from August 24, 1951, to November 4, 1951, inclusive, due to the inaccessibility of the flooded rice fields.
Beginning November 5, 1951, the contractor started to reorganize his crews and equipment to resume stringing operations. However, due to the small amount of work remaining to be performed (about 25 percent) and the probable short duration of the work, the contractor experienced considerable difficulty in recruiting capable crews to replace former employees who had obtained employment elsewhere, and lie was unable to obtain a normal efficiency and progress for some time. It is determined that the contractor was delayed the equivalent of 10 calendar days in the period following November 4,1951, due to the necessity of recruiting personnel and reorganizing his crews and equipment after the 73-day shut-down discussed * * * above.
In summary, it is found that the contractor was delayed in the completion of the work under the contract as follows:
(a) 44 calendar days during the 88-calendar day period from May 28, 1951, to August 23, 1951, inclusive, due to reduced efficiency caused by lack of sufficient transmission line towers being erected by another contractor.
(b) 73 calendar days from August 24,1951, to November 4, 1951, inclusive, due to inaccessibility of approximately 10 miles of right-of-way located in rice producing areas.
(c) 10 calendar days in the period following November 5, 1951, due to the necessity of reorganizing crews and equipment after the 73-day shut-down in Item (b) above.
Accordingly, it is further found that these delays, totaling 127 * * * calendar days, were due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, and are, therefore, excusable under * * * Article 9 of the contract.
* * * the time for completion of the work * * * is hereby extended * * * 127 calendar days, or to the final date for completion of January 29,1952.
* * * * *
21. On March 25, 1952, plaintiff wrote to the Bureau of Beclamation, noting “* * * extensions of time granted * * * as a result of delays arising from the acts of others operating under contract with the Government, thus causing *414 extra expense in our operation for which we now seek compensation.” Supporting data were attached to the letter in behalf of seven items of claim totaling $68,859.88 and listed as follows:[20]
Item 1. Extra Expense Resulting from Increase in Rate of Wages and the Addition of Payment of Travel Expense ($11,361.08).
Item 2. “Come Back” Cost for Stringing Conductor between * * * Three Spans ($1,107.82).
Item 3. Standby from August 23, 1951, to November 5, 1951 ($11,572.46).
Item 4. Retarded Progress, May 28,1951, to August 23, 1951 ($14,369.74).
Item 5. Retarded Pi'ogress in 10 Mile Section of the Line * * * ($26,170.76).
Item 6. Extra Cost Due to Increase in Insurance Rates ($237.97).
Item 7. Premium Time and Other Costs for Saturday and Sunday, January 5th and 6th, 1952, Involved in Making Crossing over P G & E Drum-Vaca 110 KV Line during Outage ($4,040.70).
22. By a payment voucher dated April 24, 1952, plaintiff certified to the Bureau of Reclamation that there remained due to it as final payment on the contract the sum of $8,196.38.[21] The voucher was paid, and on May 12, 1952, plaintiff acknowledged receipt of payment and released all claims under the contract “except for claims referred to in our letter dated March 25, 1952, and supplement thereto dated April 28, 1952.” [22]
*415 23. Plaintiff’s claims were denied.[23]
24. (a) Plaintiff filed this suit on June 2,1953. The petition set forth eight claims totaling $72,316.76. The answer denies that any amount is due to plaintiff and moves “that the petition be dismissed.”
(b) Of the eight claims alleged in the petition,[24] six are identifiable as items 1 to 6 in plaintiff’s letter of March 25, 1952.[25] One of the eight cannot be identified in plaintiff’s claim letter[26] and the content of the other can be so identified only in part.[27]
(c) In preparation for trial, defendant made an audit of plaintiff’s claims, and plaintiff checked the audit, all as provided in Eule 28 (b) .[28]
*416 (d) Counsel for the parties met and conferred at length before the trial.[29]
25. (a) At the trial,[30] (1) a Statement of Facts upon which counsel had agreed was placed in the record;[31] (2) counsel for plaintiff offered, and there were received in evidence without objection by defendant,[32] 21 exhibits in behalf of plaintiff, including the audit schedules described in paragraph (c) of the preceding finding; (3) counsel for plaintiff abandoned the first two claims summarized in paragraph 24 of the petition;[33] (4) counsel for the parties agreed that the audit figures had been accepted by plaintiff, subject (i) to a correction (by reduction) of the figure for item 1 (of the audit) [34] and (ii) to stipulation that, if plaintiff is entitled as a matter of law to recover on item 4 (of the audit) [35] the amount should be $4,800 instead of the figure ($9,696.81) shown by the audit; whereupon (5) plaintiff rested its prima facie case.
(b) In presenting its prima fade case plaintiff offered no witness. No evidence of the amount of damages was offered other than (1) the claim letter of March 25, 1952, described in finding 21, and (2) the audit schedules described in finding 24 (c). No evidence of the occurrence or cause of damages was offered other than such inferences as may be warranted from the documents introduced by plaintiff, all of which have been considered and their results incorporated in these findings.
(c) The only witness offered by plaintiff was the president of the corporation. He was called in rebuttal after defendant had closed its case. He testified (1) that plaintiff had sufficient equipment and could have recruited the neces *417 sary labor to perform the contract, if the notice to proceed (without condition) had been issued in November or December 1950 or January 1951; and (2) that plaintiff encountered no shortage of labor during the period October 1,1950, to June 1,1951. Otherwise, his testimony was strictly in the nature of rebuttal and has been considered in the formulation of the findings as a whole.
26. In its requested findings of fact plaintiff has asked for findings that it is entitled to recover $38,752.01, consist-
ing of the following six items:

Item Amount

1. Additional Expense in the Period between May 28, 1951, and August 23, 1951. (Item 4 in the claim letter.)-$4, 800. 00
2. Additional Expense in the Period between August 23, 1951, and November 4, 1951. (Item 3 in the claim letter.)_ 8,348.00
3. Additional Expense in the Rice Field Area. (Item 5 in the claim letter.)_ 15,856. 53
4. Increased Wages. (Item 1 in the claim letter.)_ 8,899.16
5. Expense of Returning to Skipped Spans. (Item 2 in the claim letter.)_ 622.06
6. Increased Insurance Rates. (Item 6 in the claim letter.)_ 226.26
27. (a) The Contracting Officer’s findings of fact of December 11, 1951, contains recitals bearing on items 1, 2, and 3 of plaintiff’s claims,[36] as follows:
(1) As to item 1: That after plaintiff began work on May 28,1951, it soon caught up with the tower erecting contractor and was forced to reduce its progress to that permitted by the progress made by the erection of towers; that it was able to do this with approximately one-half the normal size crew which resulted in one-half the normal rate of progress; that plaintiff’s progress during the period May 28 to August 23 (88 calendar days) was reduced to 50 percent normal efficiency or by 44 calendar days due to the lack of sufficient transmission line towers erected by another contractor ; that plaintiff was delayed in the completion of the work 44 calendar days during the 88-day period because of the reduced efficiency; that such delay was due to unforeseeable causes beyond the control and without fault or negli *418 gence on. the part of plaintiff; and that plaintiff was entitled to a 44-day extension of time for completion of the contract on account of such delay.
(2) As to item 2: That on August 23, 1951, having completed all work on the towers that were accessible, plaintiff was forced to cease all operations entirely until the rice crop was harvested and it was permitted to enter these areas; that the harvest of the rice crop was completed on November 4, 1951; that plaintiff was delayed 73 calendar days during the period, by unforeseeable causes beyond its control and without fault or negligence on its part; and that plaintiff was entitled to an extension of 73 days in the contract completion time because of the delay.
(3) As to item 3: That beginning November 5, 1951, plaintiff started to reorganize its crews and equipment to resume operations; that due to the small amount of work remaining to be performed and the probable short duration of the work, plaintiff experienced considerable difficulty in recruiting capable crews to replace former employees who had obtained employment elsewhere, and was therefore unable to obtain a normal efficiency and progress for some time; that plaintiff was delayed the equivalent of ten calendar days in the period following November 4,1951, due to the necessity of recruiting personnel and reorganizing its crews and equipment ; that the delay was due to unforeseeable causes beyond the control and without the fault or negligence of plaintiff; and that plaintiff was entitled, because of the delay, to a 10-day extension of the contract completion time.
(b) None of the findings made by the Contracting Officer has any bearing on items 4, 5, or 6 of plaintiff’s claims.
28. Various cost data explaining and supporting plaintiff’s several claims[37] are contained in the claim letter of March 25, 1952, and its supplement (as described in finding 21). The letter was signed by plaintiff’s president. The evidence does not identify the author of the supporting data.
29. (a) The audit schedule consists of the statement prepared by defendant of differences between “plaintiff’s claim *419 and defendant’s audit.” [38] This schedule was prepared for a limited purpose.[39] When it was offered and received in evidence at the trial, the following colloquy occurred:
Mr. Smith. I think somewhere we ought to have the record show that Plaintiff’s 17 has been marked by the plaintiff to show that the plaintiff has accepted all of the audited sums shown therein [except] for item 7 and 8, which items the plaintiff has waived.
Mr. Shriman. * * * plaintiff moves to dismiss the claims reflected in items 7 and 8 of the audit * * *.
* * * [T]he audit * * * show[s] the acceptance of the audited figures by the plaintiff for the purpose of this trial, but they are subject to further corrections * * * in the following respects: Item No. 1 * * * to be reduced from * * * $11,355.63 to * * * $8,899.16. The net effect of this correction is that it is to be taken as established, that the books and records of the plaintiff reveal that the sum of $8,899.16 was paid as increased wages in lieu of the amount stated * * * in [the] petition.
Mr. Smith. And in lieu of the audited amount?
Mr. Shriman. Yes. With respect to item 4, being
* * * the claim relating to * * * retarded progress from May 29, 1951, to August 23,1951, the audited figure of $9,696.81 should be amended to read $4,800 with the effect that it is stipulated by the parties that if * * * plaintiff is entitled to recover on this item, the amount recoverable is $4,800 * * *.
(b) In terms of the items of claim listed in finding 26, the audit schedule as modified by the colloquy recited in the preceding subsection of this finding establishes the following facts:
As to item 1 (additional expense in the period between May 28 and August 23,1951): That counsel have stipulated the amount of $4,800 as the amount of the recovery if as a matter of law plaintiff is entitled to recover.
As to item 2 (additional expense in the period between August 23 and November 4, 1951) : That plaintiff’s books show total costs for the period of $8,348.80 expended for *420 labor and equipment which plaintiff alleges to have been on standby because of its commitments to the contract in suit.
As to item 3 (additional expense in the rice field area): That those elements of cost in the rice field area which plaintiff alleges and contends should not have been incurred (or could have been avoided) are shown by plaintiff’s books to total $15,856.53.
As to item 4 (increased wages): That (through the colloquy of counsel) “* * * the books and records of the plaintiff reveal that the sum of $8,899,16 was paid as increased wages * * * ” which, the petition alleges (paragraph 18), plaintiff was compelled to pay for work during the period between May 28 and August 23,1951.
As to item 5 (expense of returning to skipped spans) r That those elements of cost in returning to string skipped spans which plaintiff alleges and contends should not have been incurred (or could have been avoided) are shown by plaintiff’s books to total $622.06.
As to item 6 (increased insurance rates) : That because of an increase of insurance rates effective November 1,1951, payments for payroll insurance as reflected by plaintiff’s books were increased by $226.26 over what they would have been had there been no increase in the rates.
30. (a) By the terms of the contract the Bureau of Kec-lamation was required to issue notice to proceed to plaintiff not later than January 16,1951.[40] On the basis of such notice, plaintiff would have been required to commence the work on or before February 5, 1951, and to have completed it on or before May 16,1951.
(b) The letter forwarded by the Bureau of Beclamation on January 16,1951, and denominated, by it as notice to proceed was a technicality, and was so recognized by both parties.
(c) Plaintiff was ready, able, and willing to proceed with the contract work at any time (on or before January 16, *421 1951) that notice to proceed might have been issued; and, assuming the absence of delays from causes over which plaintiff had no control, it could have completed the contract work within the 120 days allotted for the purpose.
31. (a) Plaintiff was delayed in the performance of the contract, as indicated by the findings of the Contracting Officer (finding 20), by the failure of the steel manufacturer to deliver the tower bodies and appurtenances on schedule; by the unusual weather of the fall and winter of 1950-51; by inability to attain normal efficiency during the summer of 1951 in the area south of the rice fields because of insufficient towers; by the flooded condition of the rice fields during the summer of 1951; and by rainy weather in late December 1951 and during January 1952.
(b) All of these delays were due to unforeseeable causes beyond plaintiff’s control and without fault or negligence on its part, and were caused by the Government’s failure to give plaintiff effective notice to proceed under the contract.
(c) The delays, due to unforeseeable causes, were likewise beyond the control of the Bureau of Eeclamation, and occurred without fault or negligence on its part.
32. (a) The cost to plaintiff of performing the contract was higher than it would have been if these delays (all or some) had not occurred.
(b) The following elements of additional cost have been established (1) as to the amount of expenditure[41] and (2) as to the cause thereof:[42]
(1) As to item 1: During the period between May 28 and August 23,1951, plaintiff incurred additional expense in the amount of $4,800 as a result of the delay which the Contracting Officer found had occurred during that period.[43]
(2) As to item 4: The wages which plaintiff paid to its workmen increased on April 1,1951, for some of its workers, *422 and on July 1, 1951, for others. The amount of increased wages paid by plaintiff, in performing the contract, subsequent to May 16, 1951, was $8,899.16.[44]
(3) As to item 5: During the period that plaintiff was-conducting its stringing operations in the southern 32 miles,, between May and August 1951, it skipped two towers inasmuch as they were not complete. It later returned to those structures and completed the stringing. In doing so, it incurred extra costs of $622.06.[45]
(4) As to item 6: Plaintiff’s payroll insurance rates were increased November 1, 1951. The amount of the increase,, for the payrolls applicable to the performance of this contract, was $226.26.[46]
(c) The following elements of alleged additional cost have not been established (1) as to the amount of expenditure or (2) as to the cause thereof:[47]
(1) As to item 2: It is not established by the evidence that the labor and equipment alleged to have been on standby between August 23 and November 4,1951, were in fact idle; or that, if any labor or equipment was on standby during that time, the condition was a reasonable consequence of the delay occurring during that period; or that any amount was expended by plaintiff for such alleged labor and equipment.
(2) As to item 3: It is not established by the evidence that plaintiff incurred additional expense in the rice field area; or that additional expense (if it in fact was incurred) would have been a reasonable consequence of the delay in that area.
(d) If plaintiff is entitled as a matter of law to recover, the amount of the recovery should be $14,547.48.[48]
*423 33. The full texts of three of the articles of the contract are set forth below.
(a) The text of Article 9 follows:
Article 9. Delays — Damages.—If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in article 1, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby. If the contractor’s right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. If the Government does not terminate the right of the contractor to proceed, the contractor shall continue the work, in which event it will be impossible to determine the actual damages for the delay and in lieu thereof the contractor shall pay to the Government as fixed, agreed, and liquidated damages for each calendar day of delay until the work is completed or accepted the amount as set forth in the specifications or accompanying papers and the contractor and his sureties shall be liable for the amount thereof: Provided, That the right of the contractor to proceed shall not be terminated or the contractor charged with liquidated damages because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes, if the contractor shall within 10 days from the beginning of any such delay (unless the contracting officer, with the approval of the head of the department or his duly authorized representative, shall grant a further period of time prior to the date of final settlement of the contract) notify the contracting officer in writing of the *424 causes of delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto.
(b) The text of Article 13 follows:
Article 13. Other contracts. — The Government may award other contracts for additional work, and the contractor shall fully cooperate with such other contractors and carefully fit his own work to that provided under other contracts as may be directed by the contracting officer. The contractor shall not commit or permit any act which will interfere with the performance of work by any other contractor.
(c) The text of Article 15 follows:
Article 15. Disfrutes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed.
34. The full texts of four paragraphs of the specifications are set forth below.
(a) Paragraph 3 of the specifications follows:
3. Rights-of-way. The Government will provide the right-of-way or the site for permanent works or installations, the site for borrow pits, channels, spoil banks, and ditches, and right-of-way for access thereto over routes established by the contracting officer. The contractor will be permitted to use such land for construction purposes but any additional right-of-way or land desired by the contractor for construction purposes shall be provided by the contractor without expense to the Government.
*425 (b) Paragraph 14 of the specifications follows:
14. Suspension o f work. The Government may at any time suspend the whole or any portion of the work under this contract but this right to suspend the work shall not be construed as denying the contractor actual, reasonable, and necessary expenses due to delays, caused by such suspension, it being understood that expenses will not be allowed for such suspensions when ordered by the Government on account of weather conditions or on account of the failure of Congress to make the necessary appropriations for expenditures under this contract.
(c) Paragraph 22 of the specifications follows:
22. Commencement, prosecution, and completion of work. The contractor shall begin work within twenty (20) calendar days after date of receipt of notice to proceed and shall complete all of the work within the following number of calendar days from the date of receipt of such notice: Schedule No. 1, three hundred and forty (340) days; and Schedule No. 2, four hundred (400) days: Provided, That, if award of contract for the work under Schedule No. 2 is made to a contractor other than the contractor awarded the contract for work under Schedule No. 1, notice to proceed for the work under Schedule No. 2 will be issued at the discretion of the contracting ofiicer any time within two hundred and eighty (280) calendar days after date of award of the contract, and the contractor under Schedule No. 2 shall complete all work thereunder within one hundred and twenty (120) calendar days from the date of receipt by him of such notice. Delays due to the operation of the national priorities system becoming effective subsequent to the date of the bid will be considered to be delays due to unforeseeable causes and beyond the control of the contractor. All required priorities for the performance of the work under these specifications shall be obtained by the contractor. The capacity of the contractor’s construction plant, sequence of operations, method of operation, and the forces employed shall, at all times during the continuance of the contract, be subject to the approval of the contracting officer and shall be such as to insure the completion of the work within the specified period of time.
(d) Paragraph 24 of the specifications follows:
24. Construction program. Within thirty (30) calendar days after date of receipt of notice to proceed, the *426 contractor shall furnish the contracting officer a complete construction program showing in detail his proposed program of operations, which construction program shall provide for orderly performance of the work. The construction program shall be in such form and in such detail as to properly show the sequence of operations and the period of time required for completion of the work under each item of each schedule. Revised construction programs shall be submitted at intervals of not more than 6 months, and, in addition thereto, the contractor shall immediately advise the contracting officer of any proposed changes in his construction program.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States fourteen thousand five hundred forty-seven-dollars and forty-eight cents ($14,547.48).

 Appurtenances included stub angles, leg extensions, crossarms, and bird guards.

 Because some of the appurtenances, notably stub angles, were used in the concrete footings for the towers, they were scheduled for earlier deliveries than the tower bodies.

 The McFarland contract is not in evidence. Presumably, however, its provisions were essentially the same as the contract in suit, since McFarland had Schedule No. 1 and plaintiff, Schedule No. 2, and both schedules were contained in one contract form.

 The prime contractor was Barrett & Hilp.

 Barrett & Hilp was also the prime contractor on this section.

 The prime contractor was Dono van-James Company.

 According to paragraph 22 of the specifications (of plaintiff’s contract: See finding 34 (c) for text), the Schedule 1 contractor was to begin work within 20 calendar days after receiving notice to proceed, which would have required McFarland to commence work on or before April 18,1950.
The evidence does not disclose the exact data on which McFarland began work.

 See findings 8 (e) and 34 (c).

 Tlie full texts of Articles 9, 13, and 15 are set forth in finding 33.

 The amount of liquidated damages was fixed at $50 per day by paragraph 23 of the specifications. Payment of liquidated damages is not an issue in this case.

 The full texts of these paragraphs (with the exception of paragraph 18) are set forth in finding 34.

 This construction schedule was not completed as programmed. If, however, McFarland had been able to make the progress indicated by the schedule, he would have had 40 percent of the towers in place by the end of September. The practice of the Bureau of Reclamation was to issue notice to proceed to the stringing contractor when towers had been placed to the extent of 40 percent, if it appeared that the tower contractor could continue on schedule. On this basis, notice to proceed would have been issued to plaintiff on or about October 1, 1050. Then, if schedules had been maintained, plaintiff’s completion time would have been the end of January 1951 (120 days from receipt of notice to proceed).

 Representatives of the Bureau of Reclamation conferred with the steel manufacturer and made an unsuccessful effort to have the former schedules of deliveries restored. The results of the conferences, in May and again in June 1950, were reported to McFarland.

 Finding 9 (a).

 Again the construction schedule was not completed as programmed. If McFarland had been able to make the progress indicated in this schedule, notice to proceed would have been issued to plaintiff about November 10 or 15, 1950. Assuming completion of the tower erection by McFarland on schedule, plaintiff would have been expected to complete his work about the middle of March 1951.

 The fields were flooded on April 23, 1951. Finding 20.

 The rice field condition was accepted by plaintiff and the Bureau of Reclamation without discussion. Plaintiff requested no advice or permission from the Bureau, and the Bureau neither offered advice nor gave direction concerning it.

 The harvesting of the rice crop was completed on November 4, 1951. The Contracting Officer subsequently made a finding that plaintiff could not have proceeded through the rice fields before the crop was harvested^ Finding 20. This conclusion was challenged at the trial. From the evidence it appears that the soil was firm enough for the work to have been resumed early in October ; and that plaintiff did not ask and defendant did not offer advice as to proceeding with the work at that time. Footnote 17.

 Plaintiff worked on the area south of the rice fields from May 28 to August 23.1951, and ceased operations from August 24 to November 4 (both inclusive).

 Plaintiff's letter of March 25, 1952, together with all supporting data (including a supplement thereto dated April 28, 1952), is in evidence as plaintiff’s Exhibit No. 10. When the exhibit was offered, the following colloquy occurred between counsel:
“Mr. Smith. Excuse me, Mr. Shriman. On that point I think it is understood between us that that is obviously being introduced for what it is and not as proof of the claims.
“Mr. Shriman. Simply as proof of the nature of the claim which was filed by the plaintiff.”
It is apparent from the remainder of the record that the attorney for defendant understood that the exhibit was being offered, as is usual in this type of case, as proof of the fact that praintiffi in the claim with defendant, and not as proof of the details set forth therein. The exhibit was received in evidence by the commissioner subject to the same understanding on his part.

 Total consideration for the contract was $175,698.92.

 The supplement related to the same seven claims submitted by the letter of March 25. It was submitted in response to a request, dated April 9, 1952, from the Construction Engineer for further information.

 This cryptic fact is drawn from a statement agreed upon by counsel, submitted to the commissioner immediately preceding the trial, and by him inserted in the record as commissioner’s Exhibit No. 1.
Notice scheduling the case for trial was forwarded to the parties on April 30, 195.6. The commissioner’s letter contained the following: “* * * The opening session of the trial will * * * be devoted to a pretrial conference * * *. * * * As a further step in preparation for a pretrial conference
it is requested that counsel for plaintiff prepare and submit to counsel for defendant * * * a statement of facts deemed not subject to controversy. The statement should be in three parts. In Part One there should be included only those facts alleged in the petition and admitted by the answer. Part Two should contain any other facts material to the controversy * * * not subject to controversy. * * * Part Three should relate to the formal allegations of the petition * *
In response to this request counsel agreed before trial upon a statement containing elements of Parts One and Three. The fact that plaintiff’s claims were denied appeared in Part One, meaning that it was alleged in the petition and admitted by the answer.

 The claims are recapitulated in paragraph 24 of the petition.

 The identifiable claims are the last six in the recapitulation in paragraph 24 of the petition, where they are listed in the order of items 1, 3, 4, 5, 6, and 2 of the items in plaintiff’s letter of March 25, 1952.

 This is the first of the claims listed in paragraph 24 of the petition.

 The second claim listed in paragraph 24 is apparently part of item 7 in plaintiff's claim letter.

 Following is the pertinent portion of the commissioner’s letter scheduling the case for trial:
“* * * With respect to the schedules of items and figures to be proved from books and records, it is noted that plaintiff has supplied a schedule to defendant; that defendant has had an audit made and has supplied plaintiff with a cross schedule of differences shown by the audit; and that plaintiff has had the cross schedule checked.
“Under the circumstances, these schedules should now be ready for use. By way of precaution, however, and to avoid any future misunderstanding or delay, it is pointed out that the purpose of the schedules and audit is to avoid the necessity of bringing the boohs and records into court for examination; that the schedules, insofar as counsel can agree upon them, are evidence of the contents of the boohs and records; that the burden of proof of damages, including amounts and the factual relation of cause and effect, remains on *416 plaintiff. In other words, the schedules are evidence of what the boohs show, hut they do not, standing alone, establish plaintiff’s case as to damages. * * *** [Emphasis supplied.]

 These conferences were arranged at the suggestion of the commissioner, since trial was (at the request of plaintiff) scheduled in Los Angeles; since plaintiff's attorney was located in Chicago; and since defendant's attorney and the commissioner were stationed in Washington.

 Trial was held in Los Angeles on June 20, 1956.

 Finding 23, footnote 23.

 Pursuant to request by the commissioner, counsel had exchanged and examined all potential documentary evidence.

 These two claim,s totaled $7,663,74.

 Also item 1 in plaintiff's letter of claim.

 Also item 4 in plaintiff’s letter of claim.

 The reference Is to plaintiff’s claims as listed In finding 26 (a).

 As listed in finding 26 (a).

 The schedule covers the eight items set forth In the petition. (Findings 24.) The six items listed in finding 26 (a) appear in the audit schedule as items 4, 3, 5, 1, 2, and 6.

 Finding 24 (c), footnote 28.

 Plaintiff’s theory of the case, as expressed by counsel at the close of the trial, rests on this requirement. Counsel said: “I want to preserve my position » * * that those documentary exhibits [referring specifically to the contract with the steel manufacturer] are not admissible if the plaintiff is right in its theory of the case; that irrespective of the nature of the reasons that prevented the Government from complying with its obligations under the contract, a breach existed if it didn't comply. * * *”

 Distinction is made here between what plaintiff’s books show, as set forth in finding 29 (b), and what the record in this case taken as a whole warrants as findings (1) that the expenditures were made and (2) the amount thereof.

 Since plaintiff offered no evidence of causation, findings pertaining to it are warranted only where the missing element is supplied in some other manner.

 Finding 29 (b) (1). The stipulation of counsel is virtually meaningless unless read in this context.

 This finding was requested by defendant. The request is tantamount to a stipulation. Cf. findings 29 (a) and 29 (b) (4).

 This finding was requested by defendant. The request is tantamount to a stipulation. See finding 29 (b) (5).

 This findings was requested by defendant. The request is tantamount to a stipulation.

 As noted in finding 27 (a) (2) and (3), the Contracting Officer made findings with respect to these elements of excusable delays. Plaintiff now relies upon these findings of delays and lack of efficiency to establish the causative factor of the damages alleged to have been incurred. The conclusion for which plaintiff contends does not follow from the evidence. The Contracting Officer was addressing himself exclusively to delays excusable under Article 9 of the contract. Nothing in the evidence suggests that he was also addressing himself to the matter of additional costs (if any) incurred as a result of the delays.

 This figure represents the sum of the items listed in the four subpara-graphs of subsection (b) of this finding.